**STATE of Minnesota, Respondent,**

v.

**George A. VASQUEZ, Appellant.**

No. A08–1683.

Court of Appeals of Minnesota.

Dec. 22, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael K. Walz, Assistant County Attorney, Minneapolis, MN, for respondent.

Marie L. Wolf, Interim Chief Appellate Public Defender, G. Tony Atwal, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by STAUBER, Presiding Judge; KLAPHAKE, Judge; and WORKE, Judge.

## OPINION

WORKE, Judge.

Appellant challenges his conviction of third-degree unintentional controlled-substance murder, arguing that the district court erred by failing to instruct the jury that he could not be convicted based on uncorroborated accomplice testimony. Because we conclude that the involvement of an accomplice required the district court to instruct the jury on the requirement of corroboration of accomplice testimony, we reverse and remand.

## FACTS

On May 29, 2007, police were dispatched to a restaurant parking lot where they found an unconscious female, A.E.W.,

slumped over behind the wheel of a vehicle. Officers noticed a male standing near the vehicle who did not immediately identify himself. The individual appeared to be nervous, but not visibly distressed. He eventually disclosed that his name was Robert Chapman and that he was A.E.W.'s companion. When officers asked about A.E.W.'s condition, Chapman initially lied, claiming that A.E.W. had not done anything to herself to induce her unconscious state. When probed further, Chapman admitted that A.E.W. had injected herself with heroin. He then confessed that after he and A.E.W. injected themselves with heroin, he got out of the car, smoked a cigarette and then noticed A.E.W. slumped over. He splashed water on her and shook her. Unable to wake her, Chapman called his then-girlfriend, Pamela Hamm, and then threw the needles and the heroin cooker into a garbage can in the restaurant bathroom.

A.E.W. was transported to the hospital where she was pronounced dead. An autopsy revealed signs of a recent injection in her right arm. After his arrest, Chapman admitted to police that on the morning of May 29, 2007, A.E.W. called him at work and asked him to go with her to obtain heroin. He was not certain if he or Hamm called to arrange the purchase with one of his suppliers, claiming that Hamm may have called if he was unsuccessful in reaching a supplier. A.E.W. picked Chapman up at work and drove to a restaurant parking lot to meet the supplier. According to Chapman, after waiting in A.E.W.'s vehicle for a period of time, appellant George Anthony Vasquez approached and got into the backseat. Chapman handed appellant $40—he and A.E.W. both contributed $20. Appellant put a small baggie containing powder that was purported to be heroin on the center console and left. Chapman did not have a conversation with appellant and looked at him only a "little bit." Although Chapman did not know appellant's name and had only a telephone number to contact him, he regularly purchased heroin from him and was familiar with him from these previous purchases.

Chapman put the heroin in a metal cup and added water. He cooked the heroin with a lighter and boiled it down into a dissolved substance. He then soaked it up with a piece of cotton to make sure no solid substance lodged in the needles. Chapman filled his needle and then he filled a needle to take home for his girlfriend, who normally obtained her heroin from him. Chapman handed the substance to A.E.W., who soaked up her needle from the cotton ball and injected herself.

Chapman eventually agreed to do a controlled buy for law enforcement authorities. On May 31, 2007, he called appellant and arranged to purchase heroin. Chapman approached appellant's vehicle at a prearranged site and stood outside of the vehicle while exchanging $40 for a bag of heroin through the driver's side window. Undercover officers followed and apprehended appellant. Chapman identified appellant as the person who sold heroin to him and A.E.W. Appellant admitted to selling heroin to Chapman on previous occasions and recalled that Chapman was frequently accompanied by a white female. Appellant admitted that he sold heroin to Chapman on May 31 (the controlled buy) and a couple of days earlier. Appellant was charged with third-degree controlled-substance murder, in violation of Minn. Stat. § 609.195(b) (2006).

The district court held a jury trial. Chapman testified consistently with his prior report to law enforcement. He further testified that he and A.E.W. were not involved romantically; they just "hung out and did drugs." In the spring of 2007,

Chapman estimated that he and A.E.W. met multiple times daily, at least four days a week, to do drugs. During this time, Chapman was living with his girlfriend. Chapman testified that he had three or four sources of heroin. To purchase the drugs, Chapman or Hamm called whichever supplier had the better stuff at the time. Chapman and Hamm did not have a land line, so when Chapman worked, he left his cell phone with Hamm. Chapman testified that he initially lied to officers about A.E.W. because he did not want to get into trouble and that he agreed to do a controlled buy to avoid going to jail. In order to do the controlled buy, Chapman called Hamm and asked her for a number to arrange a purchase. During trial, Chapman was asked, "How did you know which dealer to contact and what information to ask her for?" Chapman replied, "Because I told her the person I usually call [who] has good dope." Chapman stated that this was the person he purchased heroin from on May 29th.

An officer who took appellant's post-arrest statement testified that appellant admitted that he sold drugs to Chapman on May 31 (the controlled buy) and that he "sold to him in the past, a couple times a week." The officer testified that appellant stated that Chapman was frequently in a silver car (a description similar to that of A.E.W.'s vehicle) and often with two different females, one named "Pam." Appellant was shown photos of Hamm and A.E.W. Appellant recognized Hamm, but stated that he had never seen A.E.W. before. Appellant also seemed very puzzled about the incident that happened at the restaurant parking lot. Appellant stated that he had never been to that restaurant. The officer further testified that, according to phone records, A.E.W.'s phone was used to call a number connected to appellant only after her death.

A jail-house informant, D.S., testified that he had contact with appellant while in jail. D.S. testified that appellant told him that he sold drugs to a girl who died after overdosing. On cross-examination, D.S. testified that appellant told him that he did not know where the restaurant was located. D.S. also stated that appellant told him that he did not recall going to the restaurant. While appellant recalled meeting a young "dude" and a girl on several occasions, he did not recall meeting them on the date of the incident. D.S. received a reduced sentence in return for his testimony against appellant. The jury found appellant guilty as charged. This appeal follows.

## ISSUE

Did the district court commit plain error by failing to give an accomplice-corroboration jury instruction?

## ANALYSIS

■ Appellant argues that Chapman was an accomplice and that the district court erred by failing to instruct the jury on the requirement of corroboration of accomplice testimony. A defendant cannot be convicted based on the uncorroborated testimony of an accomplice. Minn.Stat. § 634.04 (2006) (stating that a conviction cannot be had on accomplice testimony unless the testimony has corroboration from evidence that "tends to convict the defendant of the commission of the offense"). Corroboration is insufficient "if it merely shows the commission of the offense or the circumstances thereof." *Id.* The rationale for requiring the district court to instruct the jury on corroboration of accomplice testimony is that an accomplice's credibility is inherently suspect. *State v. Lee*, 683 N.W.2d 309, 316 (Minn. 2004). An accomplice-testimony instruction does not tell the jury to disregard the

alleged accomplice's testimony or that the defendant's guilt may only be proved by the corroborating evidence. *See* 10 *Minnesota Practice*, CRIMJIG 3.18 (2006). The accomplice-instruction rule does not require that the corroborative evidence, standing alone, be sufficient to support a conviction; rather, such evidence "must affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree." *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966).

■ When a defendant does not object to the omission of an accomplice jury instruction at trial, we review the omission for plain error. *State v. Clark*, 755 N.W.2d 241, 251 (Minn.2008); *State v. Reed*, 737 N.W.2d 572, 584 n. 4 (Minn. 2007). The plain-error analysis requires the court to determine whether there was (1) an error, (2) that was plain, (3) that affected the defendant's substantial rights, and, if the first three factors are satisfied, (4) whether the error should be addressed "to ensure fairness and the integrity of the judicial proceedings." *Reed*, 737 N.W.2d at 583 (quotation omitted).

■ We must first decide if Chapman was an accomplice. "An accomplice is one who could have been charged with and convicted of the crime with which the accused is charged." *State v. Swanson*, 707 N.W.2d 645, 652 (Minn.2006). For a witness to be considered an accomplice, it should appear "that the witness co-operated with, aided, or assisted the person on trial in the commission of that crime either as principal or accessory." *Id.* at 653 (quotation omitted); *see also* Minn.Stat. § 609.05, subd. 1 (2006) ("A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."). Mere presence at the scene,

inaction, knowledge, and passive acquiescence are not enough. *State v. Palubicki*, 700 N.W.2d 476, 487 (Minn.2005). If the facts are unclear on whether the witness qualifies as an accomplice, the decision belongs to the jury. *State v. Jackson*, 746 N.W.2d 894, 898 (Minn.2008). If the facts are undisputed and only one inference can be drawn as to whether the witness qualifies as an accomplice, the decision belongs to the district court. *Id.*

■■ Appellant was charged with and convicted of third-degree controlled-substance murder. Under the applicable statute, "[w]hoever, without intent to cause death, proximately causes the death of a human being by, directly or indirectly, unlawfully selling, giving away, bartering, delivering, exchanging, distributing, or administering a controlled substance classified in schedule I or II, is guilty of murder in the third degree." Minn.Stat. § 609.195(b). For purposes of Minn.Stat. § 609.195(b), "selling" includes manufacturing controlled substances. *State v. Meyer*, 646 N.W.2d 900, 904 (Minn.App. 2002). Appellant claims that Chapman was an accomplice because he aided in the commission of the crime by manufacturing the lethal dose with which A.E.W. injected herself. *See* Minn.Stat. §§ 609.05, subd. 1 (stating that a person is criminally liable if the person intentionally aids another in the commission of a crime); .195(b) (stating that one commits third-degree controlled-substance murder when that person directly or indirectly causes death by selling, giving, bartering, delivering, exchanging, distributing, or administering a schedule I or II controlled substance); 152.02, subd. 2(2) (2006) (providing that heroin is a schedule I controlled substance).

The state contends that *State v. Carithers* is controlling in determining whether Chapman was an accomplice. 490 N.W.2d

620 (Minn.1992). The Minnesota Supreme Court reversed this court's decision in *Carithers* on the following certified question: "When a married couple jointly acquires a Schedule I controlled substance, and one of the partners uses that substance and subsequently dies from a drug overdose, did the legislature intend that the surviving partner be subject to prosecution under Minn.Stat. § 609.195(b)?" *Id. Carithers* consolidated two cases. *Id.* at 621. In one case, the appellant-husband and his wife rode together to purchase heroin. *Id.* The husband bought the heroin while his wife waited in the car. *Id.* They took the heroin home, and the husband prepared the syringes, gave one to his wife, and they "shot up" at the same time. *Id.* The wife died of a drug overdose. *Id.* In the second matter, Carithers bought heroin for herself and her husband. *Id.* She brought the heroin home, used her half, showed her husband where she hid the remaining heroin, and left the house; while she was gone, her husband prepared a syringe, injected himself and died of an overdose. *Id.*

The supreme court held that when a *married couple* jointly acquires drugs, each spouse has constructive possession and neither can be convicted of "selling" the drugs to the other, nor, therefore, be convicted under Minn.Stat. § 609.195(b). *Id.* at 622. The supreme court stated, however, that "the issue in this case is a very limited one," and that the state may be able to obtain a conviction in a different case by proving that the heroin was not jointly acquired. *Id.* at 623–24. The court further stated that the case did not involve a situation of " 'sharing' of one's individually acquired drugs with another person," but rather that of "joint acquisition and possession." *Id.* at 624. In reaching this decision the supreme court relied on *United States v. Swiderski*, 548 F.2d 445 (2nd Cir.1977). *Id.* at 622.

In *Swiderski*, the appellants were an engaged couple convicted of possession with intent to distribute cocaine. 548 F.2d at 447–48. The court held that intent to distribute, as required under the applicable statute, was not intended to include the exchange of physical possession between two persons who jointly acquired and held the drug for their own use. *Id.* at 447. The court reasoned that its interpretation followed congressional intent because the statute related to drug distribution distinguished between one who acts as a link in the chain of distribution and one who acquires possession for his or her own use. *Id.* at 451. The court stated that purchasers who simultaneously acquire a drug jointly for their own use do not perform any service as links in the chain and Congress did not intend to punish users but, rather, intended to punish drug traffickers. *Id.*

In a similar case, the District of Columbia Court of Appeals, declined to follow the holding in *Swiderski*, although refusing to conclude that the holding was incorrect. *Long v. United States*, 623 A.2d 1144, 1150–51 (D.C.1993). In *Long*, the defendant was convicted of possession of heroin with intent to distribute. *Id.* at 1144. Long admitted that four other men had given him money and he purchased heroin for the group. *Id.* at 1145. Long was in possession of ten packets of heroin and in the process of passing the heroin around to his friends when police arrived at the apartment. *Id.* Long argued that because his friends "chipped in" money in advance for the drugs, they were joint possessors from the moment he purchased the heroin. *Id.* at 1147. The court held that because the agreement to chip in money and share the heroin was illegal it created no ownership rights. *Id.* at 1148. The court distinguished *Swiderski*, stating that Long had already begun to serve, and was intending

to serve, as a link in the chain of distribution because he brought the heroin home and was about to pass out the packets. *Id.* at 1151. The court concluded that Long was more than an equal partner because he took a far more active role in the drug transaction, acting as a go-between for the other addicts. *Id.*

■ Determining whether Chapman was an accomplice requires us to look at the intent of the third-degree murder statute, which is to punish commercial drug trafficking that results in the death of a drug user. It also requires us to consider the extent of Chapman's involvement— whether his involvement was active and whether he served as a link in the chain of distribution. It could be argued that Chapman and A.E.W. jointly acquired and possessed the heroin for personal use. They drove to the restaurant together; both chipped in $20, filled their own needle, and injected themselves. But we read *Carithers* to have a limited holding. *See* 490 N.W.2d at 622 (limiting holding to situation specified in certified question of a *married* couple jointly acquiring drugs, each having acquired constructive possession). Because Chapman and A.E.W. were not married, engaged or even romantically connected, *Carithers* is not controlling.

Based on the facts here, we conclude that Chapman was an accomplice because he played a more active role than a mere drug user and served as a link in the chain of distribution. Either Chapman or his girlfriend arranged the drug purchase. And even though Chapman and A.E.W. each "chipped in" $20, Chapman made the money exchange for the heroin. *See Long,* 623 A.2d at 1150–51 (stating that the agreement to chip in money and share heroin was illegal and created no ownership rights). Further, Chapman took possession of the entire purchase and

"cooked" the heroin, playing an active role in the transaction. *See Meyer,* 646 N.W.2d at 904 (concluding that, for purposes of section 609.195(b), "selling" includes manufacturing a controlled substance); *see also State v. Rodriguez,* No. A06–711, 2007 WL 1412880, at *1 (Minn. App. May 15, 2007) (stating that drug user's action of cooking heroin was a direct cause of another drug user's death), *review denied* (Minn. Aug. 7, 2007). Finally, Chapman prepared a needle to take home to his girlfriend, acting as a go-between for another addict. *See Long,* 623 A.2d at 1151 (concluding that Long was more than an equal partner because he acted as a go-between for other addicts).

■ Concluding that Chapman was an accomplice, it was plain error for the district court to fail to instruct the jury on the corroboration requirement of accomplice testimony. We must now determine whether the district court's failure to instruct the jury on corroboration of accomplice testimony affected appellant's substantial rights. *See State v. Ihle,* 640 N.W.2d 910, 917 (Minn.2002) (stating that an error in jury instruction is prejudicial if there is a "reasonable likelihood" that the proper instruction "would have had a significant effect on the verdict of the jury"). An appellant bears the "heavy burden" of showing that the error was prejudicial to the degree that "giving of the instruction in question would have had a significant effect on the [jury's] verdict." *State v. Griller,* 583 N.W.2d 736, 741 (Minn.1998).

■ The plain error here did affect appellant's substantial rights because there is a reasonable likelihood that the proper instruction would have had a significant effect on the jury's verdict. While an accomplice instruction does not tell the jury to disregard the accomplice's testimony, *See* 10 *Minnesota Practice,* CRIMJIG 3.18, it does require that corroborating

evidence "affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree." *Sorg*, 275 Minn. at 5, 144 N.W.2d at 786.

First, we consider that the requirement for the instruction is based on the fact that the "credibility of an accomplice in inherently untrustworthy." *Lee*, 683 N.W.2d at 316. Chapman agreed to cooperate with officers and do a controlled buy in order to avoid criminal charges and jail. Therefore, it is relevant that Chapman was afforded leniency in exchange for his cooperation because he could have been charged with possession or second-degree manslaughter. *See Rodriguez*, 2007 WL 1412880, at *2 (holding that drug user was properly charged with second-degree manslaughter after he "cooked" a lethal dose of heroin for the victim). Second, the prosecutor relied heavily on Chapman's testimony. After the state rested, appellant moved for a judgment of acquittal. The prosecutor stated, "The state has presented eye witness testimony that the drugs were sold on May 29th by [appellant] to [ ] Chapman and the decedent and we believe that's sufficient credible evidence to go to the jury for a verdict." In her closing argument, the prosecutor stated, "In this case you heard from the only person still alive who can tell us what happened on May 29th. [ ] Chapman came in here and told you that it was [appellant] who sold him the drugs." Thus, the prosecutor certainly emphasized Chapman's testimony.

 We next consider whether Chapman's testimony was corroborated by significant evidence. Accomplice testimony may be corroborated by "[c]ircumstantial evidence" or other facts that "link the defendant to the crime." *Clark*, 755 N.W.2d at 254 (quotation and citation omitted). "The precise quantum of corroborative evidence needed necessarily depends on the circumstances of each case...." *Id.* at 253 (quotation omitted). The corroborating evidence must do more than show that the offense was committed or the circumstances of its commission. Minn.Stat. § 634.04. But it does not need to establish a prima facie case or even relate to every element of the offenses charged. *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982). The corroborating evidence need only be sufficient to "restore[ ] confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree." *State v. Her*, 668 N.W.2d 924, 927 (Minn.App.2003), *review denied* (Minn. Dec. 16, 2003). Such corroboration may include evidence of the defendant's motive and opportunity to commit the crime, his proximity to the place where it was committed, and his association with others involved when it suggests joint participation. *Id.*

The corroborating evidence here is not especially strong. There is evidence that appellant occasionally sold drugs to Chapman and a female companion; however, appellant was puzzled when asked about the incident outside of the restaurant, did not know where the restaurant was located, denied selling drugs to Chapman at the restaurant, and did not recognize A.E.W. when shown her photo. Additionally, the purchase methods at the controlled buy and the sale Chapman described at the restaurant were not the same. At the restaurant, the person who sold drugs to Chapman got into the backseat of the vehicle; during the controlled buy, Chapman went up to appellant's vehicle and appellant did not get out of his car. Further, Chapman had four dealers that he purchased from in May 2007. It is unclear who arranged the May 29 sale—if it was Chapman or if it was his girlfriend—and phone records do not show that a call was

made to appellant prior to A.E.W.'s death on May 29. When Chapman agreed to do the controlled buy, he called his girlfriend and asked for the number for the person he usually calls for good dope and she gave him appellant's number. Hamm never provided a statement or testified during the trial. Chapman stated that appellant was the dealer on both the 29th and the 31st, but Chapman was not able to give an accurate description of appellant, and he did not know his name.

D.S. testified that appellant admitted to committing the offense when they talked to each other in jail. But D.S. stated on cross-examination that appellant told him that he did not know where the restaurant was located and that, even though he sold drugs to Chapman and a female on previous occasions, he denied selling to them on May 29th. The other evidence connecting appellant to the offense is not compelling and the jury may have returned a different verdict if they were aware that, as an accomplice, Chapman's testimony had to have some corroboration. We therefore conclude that the failure to give the jury instruction on corroboration of accomplice testimony was plain error affecting appellant's substantial rights.

Finally, because we have determined that there was plain error affecting appellant's substantial rights, we then look to see whether the error should be addressed "to ensure fairness and the integrity of the judicial process." *Clark*, 755 N.W.2d at 252. Again, we look to the requirement that an accomplice's testimony be corroborated because of the inherent distrust of the testimony of an accomplice, a person who "may testify against another in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives." *Id.* at 251 (quotation omitted).

Chapman's cooperation in the controlled buy and in the case against appellant was motivated by his desire to avoid jail. He testified to such motivation. And he was not charged with anything; we already acknowledged that he could have been charged with possession or second-degree manslaughter. Chapman also testified that he initially lied to officers and disposed of evidence so that he would not get into any trouble. Officers testified that appellant initially lied and was elusive. Minn.Stat. § 634.04 states that "[a] conviction cannot be had" unless the testimony of an accomplice "is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." The statute requires the district court to "submit to the jury the question of whether the corroborative evidence is trustworthy by an assessment of the credibility of the corroborative testimony." *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989). Based on the requirement of an accomplice instruction and the record in this proceeding, we conclude that the district court's omission of the accomplice jury instruction was plain error and that its absence affected the fairness and integrity of appellant's conviction. Appellant argues that his conviction should be reversed and double jeopardy should attach. But appellant did not challenge the sufficiency of the evidence; he challenged the failure to instruct on accomplice testimony.

### DECISION

Because we conclude that Chapman is an accomplice and the corroborating evidence is not strong, the failure to instruct the jury on the corroboration requirement was plain error; therefore, we reverse and remand for a new trial.

**Reversed and remanded.**